AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

```
FILED
CLERK, U.S. DISTRICT COURT
7/28/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___VAV___ DEPUTY
```

| | |
|---|---|
| United States of America<br><br>v.<br><br>JOEY VALENTINO,<br>  aka "Jose Garza,"<br>  aka "Hollywood Joe,"<br>  aka "Joey,"<br><br>Defendant(s) | Case No.   2:22-mj-02943-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 25, 2022 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Vanessa Tinajero
Complainant's signature

Vanessa Tinajero, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: July 28, 2022

*Judge's signature*

City and state:  Los Angeles, California

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
*Printed name and title*

AUSA: James A. Santiago (x2229)

**AFFIDAVIT**

I, Vanessa Tinajero, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Joey VALENTINO, also known as "Jose Garza," aka "Hollywood Joe," aka "Joey" ("VALENTINO") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search the following digital device (the "SUBJECT DEVICE"), in the custody of the Los Angeles Police Department, in Los Angeles, California, as described more fully in Attachment A:

   a. One (1) Cellular Phone designed by One Plus, Model: BE2025, FCC ID: 2ABZ2-EF170, IMEI: 990017122791433, seized from VALENTINO during his arrest on July 25, 2022.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) and 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.    BACKGROUND OF AFFIANT

5.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since June 2021.  I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

6.    I am currently assigned to a Criminal Enterprise Squad at the Los Angeles Field Office of the FBI, which investigates criminal gang activity.  I am also a member of the FBI Los Angeles Metropolitan Task Force on Violent Gangs, a multi-agency federal, state, and local gang task force.

7.    As an SA, I have participated in investigations including gang activity, and firearms and narcotics trafficking.  For the past eight months, I have primarily investigated violent

street gangs involved in narcotics distribution crimes, gun crimes, and criminal conspiracies.

8. Throughout my investigations, I have used a variety of law enforcement techniques, including physical and electronic surveillance, controlled drug buys, interviews of witnesses and subjects and use of confidential informants. I have also completed training for monitoring Title III communications and wire interceptions.

9. As an SA, I have received formal training in investigating federal crimes, including federal narcotic and conspiracy crimes. Throughout my law enforcement career, I have learned about gangs, gang culture, and gang operations through both experienced law enforcement officers and knowledgeable confidential sources.

10. Through my experience and training and conversations with more experienced agents and officers, I have also learned about how firearms are acquired and controlled substances are distributed and sold. I have become familiar with the efforts of individuals engaged in the manufacturing, distribution, and sale of firearms to avoid detection and apprehension by law enforcement officers.

### III.  SUMMARY OF PROBABLE CAUSE

11. On or about July 25, 2022, the Los Angeles Metropolitan Task Force for Violent Gangs (the "Task Force") executed a California search warrant at VALENTINO's residence at 1335 South Flower Street #A705, Los Angeles, CA 90015 ("the Residence,"), and VALENTINO's 2018 Jeep Rubicon California

License Plate #8DEB581 ("the Jeep"). When officers arrived to conduct the search, VALENTINO told officers he had methamphetamine, fentanyl, and a firearm in his room inside the Residence. VALENTINO is a convicted felon who is on formal probation and is prohibited from possessing firearms. Inside VALENTINO's room, officers found narcotics, a rifle in the closet, US currency, Los Angeles Police Department and Los Angeles Sheriff's Department clothing, ammunition magazines, miscellaneous identification paperwork, two Ipads, and a body camera. Inside a safe in the living room of the Residence, officers found a brick wrapped in brown tape resembling heroin, a brick marked "500" resembling cocaine, plastic baggies containing powder resembling cocaine, two plastic bags containing a crystal like substance resembling methamphetamine, a plastic bag containing a gray powder resembling fentanyl, a zip lock bag containing purple powder resembling fentanyl, a plastic bag containing blue pills marked with "C1" resembling unknown narcotics, a clear plastic bag containing white pills resembling unknown narcotics, three firearms, varying ammunition magazines, several rounds of different caliber ammunition, US currency, an ID scanner, and miscellaneous baseball cards inside a black bag.

## IV.   STATEMENT OF PROBABLE CAUSE

12. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A. Officers Execute a Search Warrant at the Residence**

13. On July 25, 2022, Task Force Officer ("TFO") Yudidt Martinez obtained a California state search warrant for 1355 Flower Street Unit #A705, Los Angeles, CA 90015 issued by the Honorable Teresa Sullivan of the Superior Court of California, County of Los Angeles. On July 25, 2022, members of the Task Force knocked on the front door of the Residence, announced their presence, and ordered the occupants to exit the Residence. After several knocks and announcements, a female, later identified as J.P., opened the door and exited the Residence, followed by VALENTINO, and two additional females, later identified as Y.M. and D.M. VALENTINO was on formal probation following a conviction for a violation of California Penal Code Section 29800(a)(1) (Felon in Possession of a Firearm), and his probation conditions authorized officers to search his residence at any time, with or without a warrant. Task Force members entered the Residence and conducted a protective sweep of the Residence.

14. As VALENTINO was exiting the residence, TFO Dennis Jarrott saw VALENTINO place the SUBJECT DEVICE on a table by the front door.

15. Outside the Residence, TFO Kevan Beard asked VALENTINO if the location to be searched was his apartment, and VALENTINO answered "yes." Officers asked VALENTINO if there was anything inside the location that could hurt the officers conducting the search, VALENTINO said, "yea I have meth, fent, and a gun in my room."

5

**B. Officers Located Narcotics and Firearms Inside the Residence.**

16. During the search, Task Force members located and seized the following from VALENTINO's bedroom:[1]

    a. A crystal-like substance resembling methamphetamine in a plastic container on the nightstand shelf; and

    b. A tan color bolt action rifle with a folding stock, and a "Pro Mag" loaded magazine containing six rounds of ammunition in the bedroom closet.

17. During the search, Task Force members located and seized the following from the kitchen:

    a. On the kitchen counter, a crystal-like substance resembling methamphetamine; and

    b. In the kitchen pantry, an off-white powder like substance resembling cocaine;

18. During the search, Task Force members located and seized the following from a second bedroom which contained women's clothing and make-up throughout the room:

    a. Two plastic containers containing crystal-like substances resembling methamphetamine.

19. During the search, Task Force members located and seized the following from a safe, which was directly outside VALENTINO's bedroom:

---

[1] Officers located men's clothing, which appeared to match VALENTINO's stature, inside the bedroom closet. Additionally, officers located prescription medication in VALENTINO's name, in the bathroom located within the bedroom.

6

   a. Two zip-lock bags containing a brick wrapped in brown tape containing a black tar substance resembling heroin;

   b. A zip-lock bag containing orange duct tape with a marking of "500" resembling cocaine;

   c. Plastic baggies containing a powder-like substance resembling cocaine;

   d. Plastic baggies containing a crystal-like substance resembling methamphetamine;

   e. A plastic bag containing a gray powder-like substance resembling fentanyl;

   f. A clear zip lock bag containing a purple powder-like substance resembling fentanyl;

   g. A clear plastic bag containing blue pills marked with "M30" resembling fentanyl;

   h. A clear plastic baggy containing blue pills marked with "C1" resembling an unknown narcotic;

   i. A clear plastic baggy containing white pills resembling an unknown narcotic;

   j. A Heckler & Koach USP semi-automatic pistol with a magazine loaded with ten (10) rounds of ammunition;

   k. A Ruger LCP semi-automatic pistol with a magazine loaded with six (6) rounds of ammunition;

   l. A Young America double action revolver;

   m. 112 rounds of varying ammunition;

   n. One empty brown thirty-four (34) round high capacity magazine;

   o. One empty black eight-round Glock magazine;

7

      p.    One black Allen rifle case; and

      q.    One .45 caliber magazine loaded with six (6) rounds of ammunition.

**D. VALENTINO's Criminal History**

20. On July 26, 2022, I reviewed criminal history records for VALENTINO and learned that VALENTINO has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

      a.    On or about August 23, 1989, a violation of California Health and Safety Code Section 11378, Possession for Sale, in the Superior Court for the State of California, County of Riverside, Case Number ICR-12265.

      b.    On or about October 23, 1989, a violation of California Health and Safety Code Section 11377(a), Unauthorized Possession of Controlled Substance, in the Superior Court for the State of California, County of Riverside, Case Number ICR-12685.

      c.    On or about October 23, 1989, a violation of California Vehicle Code Section 10851, Theft and Unlawful Driving or Taking of a Vehicle, in the Superior Court for the State of California, County of Riverside, Case Number ICR-12684.

      d.    On or about October 23, 1989, a violation of California Vehicle Code Section 10851, Theft and Unlawful Driving or Taking of a Vehicle, in the Superior Court for the State of California, County of Riverside, Case Number ICR-12683.

      e.    On or about November 8, 1991, a violation of California Vehicle Code Section 10851, Theft and Unlawful

Driving or Taking of a Vehicle, in the Superior Court for the State of California, County of Riverside, Case Number ICR-14947.

      f.   On or about December 1, 1993, two counts of a violation of California Penal Code Section 487.1, Grand Theft, in the Superior Court for the State of California, County of Los Angeles, Case Number KA19715.

      g.   On or about September 22, 1994, a violation of California Health and Safety Code Section 11378, Possession for Sale, and California Vehicle Code Section 10851, Theft and Unlawful Driving or Taking of a Vehicle, in the Superior Court for the State of California, County of Riverside, Case Number ICR-17250.

      h.   On or about October 29, 1997, a violation of California Health and Safety Code Section 11377(a), Unauthorized Possession of Controlled Substance, in the Superior Court for the State of California, County of Los Angeles, Case Number BA145612.

      i.   On or about October 28, 1998, a violation of California Health and Safety Code Section 11378, Possession for Sale, in the Superior Court for the State of California, County of Los Angeles, Case Number SA032090-03.

      j.   On or about May 28, 2004, a violation of California Health and Safety Code Section 11366, Opening or Maintenance of Unlawful Places: Sell Controlled Substance; California Health and Safety Code Section 11378, Possession for Sale; California Health and Safety Code Section 11379(a), Transportation, Sale, or Furnishing of a Controlled Substance,

in the Superior Court for the State of California, County of Los Angeles, Case Number BA253427.

  k. On or about January 5, 2018, a violation of California Penal Code Section 530.5(a), Unauthorized Use of Personally Identifiable Information, in the Superior Court for the State of California, County of Los Angeles, Case Number XNEGA10075501.

  l. On or about September 1, 2020, a violation of California Penal Code Section 29800(a)(1), Felon in Possession of a Firearm, in the Superior Court for the State of California, County of Los Angeles, Case Number LACBA48610101.

### E. Drug Test

21. On July 27, 2022, SA Tinajero field tested the containers of approximately 163.2 grams of white crystal-like substance suspected to be methamphetamine, which were located inside VALENTINO's bedroom. The substance tested positive for methamphetamine.

### F. Interstate Nexus

22. On July 26, 2022, FBI SA Christopher Harris, an expert in firearms and interstate nexus, reviewed the firearms and the ammunition recovered from VALENTINO's residence and concluded that the four firearms, a rifle and three handguns, and all of the ammunition were manufactured outside of the state of California. Therefore, in Agent Harris' opinion, because the firearms and ammunition were found in California, they must have traveled in and affected interstate commerce.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

23. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

    c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or

11

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

       d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

### VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

24.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

       a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

       b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These

12

photographs and recordings are often shared via social media, text messages, and over text messaging applications.

      c.  Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

### VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

25.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

26.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

       b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain

14

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    27.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

28. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

   a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

   b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

   c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

appears to have a biometric sensor and falls within the scope of the warrant: (1) depress VALENTINO's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of VALENTINO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

29. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII. CONCLUSION

30. For all of the reasons described above, there is probable cause to believe that VALENTINO has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __28th__ day of
July, 2022.

_Alicia G. Rosenberg_
THE HONORABLE ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE